## THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS
## EAST SAINT LOUIS DIVISION

| | |
|---|---|
| **Kara Fitterer, Individually and On Behalf of All Others Similarly Situated**, <br><br> Plaintiff, <br><br> v. <br><br> **LUMBER LIQUIDATORS, INC., a Delaware corporation, and LUMBER LIQUIDATORS HOLDINGS, INC., a Delaware corporation,** <br><br> Defendants. | **Case No. 15-266** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

## <u>PLAINTIFF'S CLASS ACTION COMPLAINT</u>

Plaintiff Kara Fitterer, individually and on behalf of all others similarly situated, by and through undersigned counsel, and hereby brings Plaintiff's Class Action Complaint against LUMBER LIQUIDATORS, INC. and LUMBER LIQUIDATORS HOLDINGS, INC.  In support, thereof, Plaintiff hereby alleges:

### <u>INTRODUCTION</u>

1.     This action seeks to remedy the continuing failure of Defendants Lumber Liquidators, Inc. and Lumber Liquidators Holdings, Inc., ("Lumber Liquidators" or "Defendants") to warn consumers that they are being exposed to formaldehyde, a substance known to the State of California to cause cancer. Such exposures have occurred, and continue to occur, through the marketing, distribution, sale and use in California of certain laminate flooring products containing the cancer-causing chemical, formaldehyde, and sold by Lumber Liquidators (collectively the "PRODUCTS").

2.     Defendants' failure to warn is even more egregious due to their false and

misleading statements concerning formaldehyde emissions released from certain of the PRODUCTS.

3.      In contrast to Lumber Liquidators' direct representations on its product labels, website, and warranties that its flooring products comply with strict formaldehyde standards, testing has shown that the toxic formaldehyde levels released from many of the Defendants' Chinese-made laminate flooring products are far above 40 µg/day.  It has been reported that over fifty tests have been implemented using various test methods and two different laboratory locations. Test results showed average exposures at the time of testing exceeded 4,000 micrograms per day ("µg/day") – over 100 times above the 40 µg/day threshold established by California's Safe Drinking Water and Toxic Enforcement Act of 1986, Health and Safety Code ("H&S Code") section 25249.5, *et seq.*, ("Proposition 65"). Even accounting for a decrease in formaldehyde emissions over time, the daily exposures are still well above 40 µg/day. According to Lumber Liquidators' public filings, the significant majority of its laminate flooring products is sourced in China.

4.      Lumber Liquidators advertises, "At Lumber Liquidators, we negotiate directly with the mills and eliminate the middleman. And that means big savings on flooring for you." (www.lumberliquidators.com/ll/home). But, as described below in more detail, Lumber Liquidators' low prices are due in part to its business practice of selling inexpensive, largely Chinese-sourced products that violate applicable formaldehyde standards and Lumber Liquidators' failure to warn the public of the high formaldehyde levels in its products.

5.      Formaldehyde gas (hereinafter, the "LISTED CHEMICAL" or "formaldehyde") is a substance known to cause cancer.  Exposure to formaldehyde is linked to increased risk of cancer of the nose, sinuses, nasopharyngeal and oropharyngeal cancer, and lung cancer.

Formaldehyde also causes burning eyes, nose and throat irritation, coughing, headaches, dizziness, joint pain and nausea.

6.      Laminate wood flooring is generally composed of a base layer of pressed wood (frequently medium-density fiberboard (MDF)), which is a mixture of wood particles bonded together with glue or resin, a high-quality photographic image of wood, and a scratch-resistant coating.

7.      Inexpensive laminate wood flooring, often produced in China, can be a significant source of formaldehyde gas since formaldehyde-based glues and resins (in particular ureaformaldehyde resin) are often used to hold the pressed wood particles together.

8.      Plaintiff understands that it is possible to manufacture pressed wood products with different mixtures of urea-formaldehyde resins and thus a range of formaldehyde emissions. Some pressed wood products have low, or no, added formaldehyde. However, such low-emission products may have longer curing times, lower manufacturing throughput, and higher production costs. On information and belief, these costs are higher than the levels Chinese mills are accustomed to incurring in producing inexpensive laminate flooring of the type sold by Lumber Liquidators.

9.      Lumber Liquidators products produced in China emit formaldehyde at far higher rates than those manufactured in Europe or North America – on average, Chinese products emitted at 350% the rate of European/North American products.

10.      As the handling and/or use of the PRODUCTS causes exposures to formaldehyde, Lumber Liquidators' sale and continued selling of the PRODUCTS without the warnings has caused and continues to cause individuals (and in particular children and the elderly who spend more of their day at home) to be involuntarily and unwittingly exposed to formaldehyde.

11.     Plaintiff seeks injunctive relief enjoining Defendants from the continued participation in the manufacturing and packaging process for the PRODUCTS and the distribution, marketing and/or sale of the PRODUCTS without provision of clear and reasonable warnings regarding the risks of cancer posed by exposure to the LISTED CHEMICAL through the use and/or handling of the PRODUCTS. Plaintiff seeks an injunctive order compelling Defendants to provide a clear and reasonable warning to each individual who has been in the past and who in the future may be exposed to the LISTED CHEMICAL from the use of the PRODUCTS. Plaintiff seeks an injunction prohibiting Defendants from offering the PRODUCTS for sale without either reformulating the PRODUCTS such that a formaldehyde warning is not necessary or providing clear and reasonable warnings. Plaintiff also seeks an order compelling Defendants to identify and locate each individual person who in the past has purchased the PRODUCTS, and to provide to each such purchaser a clear and reasonable warning that the use of the PRODUCTS will cause exposures to the LISTED CHEMICAL. Plaintiff further seeks an order compelling Defendants to waive any applicable restocking fees which would otherwise be charged to an individual who seeks to return the PRODUCTS after receiving a clear and reasonable warning.

**PARTIES**

12.     Plaintiff Kara Fitterer is a citizen of the State of Illinois, residing in the city of Edwardsville.

13.     Defendant LUMBER LIQUIDATORS, INC. ("LUMBER LIQUIDATORS") is a corporation organized under the State of Delaware's Corporation Law, with its principal place of business located at 3000 John Deere Road, Toano, Virginia.

14.     LUMBER LIQUIDATORS directly or indirectly engages third party mills to

manufacture and package the PRODUCTS and distributes, markets, and/or sells the PRODUCTS, in each case, for sale or use throughout the United States, including Illinois.

15.     Defendant LUMBER LIQUIDATORS HOLDINGS, INC., ("LLH") is a corporation organized under the State of Delaware's Corporation Law, with its principal place of business located at 3000 John Deere Road, Toano, Virginia.

16.     LLH directly or indirectly engages third party mills to manufacture and package the PRODUCTS and distributes, markets and/or sells the PRODUCTS, in each case, for sale or use throughout the United States, including Illinois.

17.     LUMBER LIQUIDATORS and LLH shall be jointly referred to as "Lumber Liquidators" or "Defendants."

18.     Lumber Liquidators is one of the largest specialty retailers of hardwood flooring in the United States, with over 300 retail stores in 46 states, including 34 stores in California and three stores in Alameda County.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § l332(d)(2) because the matter in controversy, upon information and belief, exceeds $5,000,000, exclusive of interest and costs, and this is a class action in which the Class members and Defendant are citizens of different states.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because the Lead Plaintiff is a resident of this judicial district and does business throughout this district, and a substantial part of the events or omissions giving rise to Plaintiff's claims took place within this district.

21.     Defendants have transacted substantial and continuous business in the State of

Illinois and this District, and have committed tortious acts in this State and in this District that form the basis for this cause of action.  Thus, this Court has personal jurisdiction over defendants.

## TOLLING OF STATUTES OF LIMITATIONS

22.    Defendant was and remains under a continuing duty to disclose to Plaintiff and members of the Class the true character, quality and nature of the Products, that this defect is based on a poor design and/or substandard materials, and that it will require costly repairs, poses a safety concern, and diminishes the resale value of the Products.  As a result of this active concealment by Defendant, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL BACKGROUND

### Plaintiff Fitterer's Factual Allegations

23.    Plaintiff Kara Fitterer ("Plaintiff") is a citizen of the State of Illinois and resides in Edwardsville, Illinois.

24.    On or about February 20, 2015, Plaintiff purchased approximately 623 sq. ft. of 12 mm Dream Home Kensington Manor Sandy Hills Hickory Laminate Flooring from Lumber Liquidators, Inc. Store #1240, located at 5520 North Illinois St., Fairview Heights, IL 62208.

25.    Plaintiff spent approximately $2,888.90 for materials and other installation supplies from Lumber Liquidators.

26.    The 12 mm Dream Home Kensington Manor Sandy Hills Hickory Laminate Flooring was installed at the residence of Kayla Fitterer in Fairview Heights, Illinois, by Kara Fitterer, Richard Stroh, and Jacob Streuter, who spent approximately 24 hours in time/labor.

27.     On March 2, 2015, Plaintiff first became aware the 12 mm Dream Home Kensington Manor Sandy Hills Hickory Laminate Flooring contained dangerously high levels of formaldehyde.  Plaintiff notified Lumber Liquidators of the defect in person at their Fairview Heights retail location on March 3, 2015.  The in-store representative was unable to provide any remedy to the situation.  Plaintiff submitted an email on March 4, 2015, to the Lumber Liquidators Customer Compare Department further notifying them of the defect.

### Government Regulation of Formaldehyde in Composite Wood Products

28.     Government Regulation of Formaldehyde in Composite Wood Products 47. According to the Environmental Protection Agency, formaldehyde is a "colorless, pungent-smelling gas" that has been shown to cause cancer in humans along with a host of other potential health issues, including eye, nose and throat irritation, wheezing and coughing, fatigue, severe allergic reactions and more. The International Agency for Research on Cancer classified formaldehyde as "carcinogenic to humans" in 2004, based on the increased risk of nasopharyngeal cancer. Formaldehyde was also designated as a toxic air contaminant in California in 1992 with no safe level of exposure.

29.     Formaldehyde is a component in the production of pressed wood products. One of the major sources of exposure to formaldehyde is from inhalation of formaldehyde emitted from composite wood products containing urea-formaldehyde resins. Because of that, the federal government imposes limits on the amount of formaldehyde that can be present in wood products.

30.     On July 7, 2010, President Obama signed the Formaldehyde Standards for Composite-Wood Products Act into law (the "FSCWP Act"). This legislation, which adds a Title VI to Toxic Substances Control Act ("TSCA"), establishes limits for formaldehyde emissions from composite wood products: hardwood plywood, medium-density fiberboard, and

particleboard.

31.     The national emission standards in the FSCWP Act mirror standards previously established by the California Air Resources Board ("CARB") for products sold, offered for sale, supplied, used or manufactured for sale in California. The CARB standards have been in effect since January 1, 2009. CARB requires formaldehyde emission standard compliance from distributors and importers like Lumber Liquidators.

32.     The CARB set limits on how much formaldehyde may be released from composite wood products, including hardwood plywood, medium-density fiberboard, particleboard and finished goods containing these products that are sold, supplied, offered for sale, manufactured, or imported in the United States. The rules include additional implementing provisions addressing testing requirements, laminated products, product labeling, chain of custody, recordkeeping, stockpiling and enforcement.

33.     Specifically, CARB dictates that all HWPW (Hardwood Plywood) products sold in the state of California should emit no more than 0.05 ppm (parts per million). Violations of CARB regulations may result in severe penalties assessed against the offending entities.

34.     The CARB also established a third-party certification framework designed to ensure that manufacturers of composite wood products meet the CARB formaldehyde emission standards by having their composite wood products certified though an accredited third-party certifier. Under this rule, third-party certifiers would audit composite wood panel producers and verify compliance with formaldehyde emissions standards for their products.

<u>**The Business of Lumber Liquidators**</u>

35.     Lumber Liquidators is one of the largest specialty retailers of hardwood flooring in the United States. The Company prides itself on having one of the largest inventories of

prefinished and unfinished hardwood floors in the industry. Lumber Liquidators carries solid and engineered hardwood, laminate flooring, bamboo flooring, cork flooring and resilient vinyl flooring, butcher blocks, molding, accessories, and tools. These products are primarily sold under the Company's private label brands. The Company sells to homeowners directly or to contractors acting on behalf of homeowners through its network of approximately 300 retail stores in 46 states.

36. The Company began in 1993 when Defendant Sullivan, a then building contractor, began purchasing excess wood and reselling it from the back of a trucking yard in Stoughton, Massachusetts. The Company eventually focused on hardwood flooring. The Company's first store opened on January 5, 1996 in West Roxbury, Massachusetts. Eight months later, a second store opened in Harford, Connecticut, and from there the Company expanded.

37. The Company moved headquarters from Boston to Colonial Heights, Virginia in 1999. In 2004, the Company moved its headquarters to its current location, 306,000 square foot production center in Toano, Virginia.

**Fomaldehyde**

38. On January 1, 1988, the State of California officially listed Formaldehyde (gas) as a chemical known to cause cancer. Formaldehyde became subject to the warning requirement one year later and was therefore subject to the "clear and reasonable" warning requirements of Proposition 65 beginning on January 1, 1989. (27 CCR §25000, et seq.; H&S Code §25249.5, et seq.).

39. Due to the high toxicity of formaldehyde, the "safe harbor" no significant risk level for formaldehyde is 40 µg/day (micrograms per day). 27 CCR § 25705(c).

40. Defendants distribute, market, and/or sell certain flooring products containing

formaldehyde, including, but not limited to, each of the following PRODUCTS:

a.      8 mm Dream Home Nirvana Royal Mahogany Laminate Flooring;

b.      8 mm Dream Home Nirvana French Oak Laminate Flooring;

c.      8 mm Bristol County Cherry Laminate Flooring;

d.      12 mm Dream Home Kensington Manor Warm Springs Chestnut Laminate Flooring;

e.      12mm Dream Home Kensington Manor High Sholes Hickory Laminate Flooring;

f.      12 mm Dream Home Kensington Manor Sandy Hills Hickory Laminate Flooring;

g.      12 mm Dream Home Kensington Manor Imperial Teak Laminate Flooring;

h.      12 mm Dream Home Kensington Manor Cape Doctor Laminate Flooring;

i.      12 mm Dream Home Kensington Manor Antique Bamboo Laminate Flooring;

j.      12 mm Dream Home Kensington Manor Imperial Teak Laminate Flooring;

k.      12 mm Dream Home Kensington Manor Tanzanian Wenge Laminate Flooring;

l.      12 mm Dream Home Kensington Manor Golden Teak Laminate Flooring;

m.      12 mm Dream Home Kensington Manor Summer Retreat Teak Laminate Flooring;

n.      12 mm Dream Home Kensington Manor Peak Poplar Laminate Flooring;

o.      12 mm Dream Home Kensington Manor Fumed African Ironwood Laminate Flooring;

p.      12 mm Dream Home Ispiri Chimney Tops Smoked Oak Laminate Flooring;

q.      12 mm Dream Home Ispiri Poplar Forest Oak Laminate Flooring Laminate Flooring;

r.      12 mm Ispiri African Thuya Burlwood Laminate Flooring;

10

s.      12 mm Dream Ispiri American Mission Olive Laminate Flooring Laminate Flooring;

t.      12 mm Ispiri Mill RIver Walnut Laminate Flooring;

u.      12 mm Dream Home St. James Oceanside Plank Bamboo Laminate Flooring;

v.      12 mm Dream Home St. James Cumberland Mountain Oak Laminate Flooring;

w.     12 mm Dream Home St. James Vintner's Reserve Laminate Flooring;

x.      12 mm Dream Home St. James Golden-Acacia Laminate Flooring;

y.      12 mm Dream Home St. James Brazilian Koa Laminate Flooring;

z.      12 mm Dream Home St. James Blacksburg Barn Board Laminate Flooring;

aa.     12 mm Dream Home St. James Nantucket Beech Laminate Flooring;

bb.     12 mm Dream Home St. James Chimney Rock Charcoal Laminate Flooring;

cc.     12 mm Dream Home St. James African Mahogany Laminate Flooring;

dd.     15 mm Dream Home St. James Sky Lakes Pine Laminate Flooring;

41.     Lumber Liquidators' laminate flooring samples from China produces formaldehyde exposures that were at the time of testing far in excess of the 40 µg/day.  Average exposures exceed 4,000 µg/day – over 100 times above 40 µg/day.PRODUCTS manufactured in Europe or North America produced vastly lower formaldehyde emissions than the PRODUCTS manufactured in China (over 70% less). Even though the products manufactured in Europe and North America have significantly lower emissions, the associated exposures are still well above 40 µg/day. Even accounting for the decrease in formaldehyde emissions over time, the daily exposures are still well above 40 µg/day

## LUMBER LIQUIDATORS KNOWINGLY
## EXPOSED THE PUBLIC TO FORMALDEHYDE

42.     At all times relevant to this action, Lumber Liquidators has knowingly exposed

users and handlers of the PRODUCTS to formaldehyde without first giving a clear and reasonable warning to such individuals.

43.    People are being unwittingly exposed to formaldehyde through inhalation on a daily basis, particularly since flooring products often cover much of the floor area of a home, where children, adults and the elderly spend most of their time every day for decades.

44.    On June 20, 2013, the widely-read financial-industry website, Seeking Alpha, published a lengthy article documenting high formaldehyde levels in Chinese-made laminate flooring sold by Lumber Liquidators. The author of the article, Xuhua Zhou, retained a certified laboratory to test three samples of Chinese-made engineered wood flooring sold by Lumber Liquidators. Mr. Zhou's article states, "The tested product, Mayflower 5/16" x 5" Bund Birch Engineered, emits a staggering three and half times over the government mandated maximum emission level. The product is clearly not CARB [California Air Resources Board] compliant yet Lumber Liquidators tagged CARB compliance on the box." (http://seekingalpha.com/article/1513142-illegal-products-could-spell-big-trouble-at-lumber-liquidators).

45.    Mr. Zhou presented his findings to the California Air Resources Board on or about June19, 2013.

46.    On or about November 26, 2013, a federal securities class action lawsuit was filed against Lumber Liquidators in the United States District Court in Virginia based on drops in the stock price following the Seeking Alpha article and its allegations concerning formaldehyde. (*Kiken v. Lumber Liquidators Holdings, Inc.*, et al., 4:2013-cv-00157 (E.D.Va)).

47.    On or about December 3, 2013, a class action complaint was filed against Lumber Liquidators alleging claims related to illegal formaldehyde exposures. (*Williamson v.*

*LumberLiquidators Holdings, Inc.*, 1:13-cv-01487-AJT-TCB (E.D.Va.)). Although the case was dismissed due to a technicality, there can be no question that Lumber Liquidators was made aware of the formaldehyde problem with its Chinese-made products.

48.     60 minutes ran a detailed story exposing the formaldehyde emissions of the PRODUCTS.

49.     Based on these lawsuits and news stories, there can be no question that at all times relevant to this action, Defendants have knowingly and intentionally exposed the users and/or handlers of the PRODUCTS to the LISTED CHEMICAL without first giving an adequate warning to such individuals.

50.     The PRODUCTS have been sold by Defendants for use in Illinois since at least 2012.

51.     The PRODUCTS continue to be distributed and sold in Illinois without the requisite warning information.

52.     As a proximate result of acts by Defendants, individuals, including in this District, have been exposed to the LISTED CHEMICAL without an adequate warning. The individuals subject to the illegal exposures include normal and foreseeable users of the PRODUCTS, as well as all other persons exposed to the PRODUCTS.

**LUMBER LIQUIDATORS HAS NOT PROVIDED
ADEQUATE WARNINGS FOR ANY OF THE PRODUCTS**

53.     At all times relevant to this action, Lumber Liquidators has failed to adequately warn individuals in the State of Illinois before exposing those individuals to cancer-causing formaldehyde.

54.     At all times relevant to this action, Lumber Liquidators has failed to take off the language CARB 2 Complaint language on the boxes of its PRODUCTS.

55.    At all times relevant to this action, Lumber Liquidators sales representatives have failed to warn consumers that its PRODUCTS contain cancer-causing formaldehyde.

56.    At all times relevant to this action, Lumber Liquidators has failed to place an adequate warning in its marketing materials.

57.    At all times relevant to this action, Lumber Liquidators has failed to place an adequate warning in its stores or store shelves.

58.    At all times relevant to this action, Lumber Liquidators has failed to place an adequate warning on its website.

### RATHER THAN WARN THE PUBLIC, LUMBER LIQUIDATORS ENGAGED IN A CAMPAIGN OF FALSE OR MISLEADING STATEMENTS CONCERNING FORMALDEHYDE

59.    Despite being informed of the presence of high levels of formaldehyde in its PRODUCTS, Lumber Liquidators engaged in a campaign to mislead the public with misleading information concerning the safety of its products.

60.    Lumber Liquidators' website leads consumers to believe that the Company's flooring products comply with the CARB formaldehyde and other California standards. The website states(emphasis in the original):

**"Is Lumber Liquidators Compliant with the California law?**

**Laminate and engineered flooring products sold by Lumber Liquidators are purchased from mills whose production method has been certified by a Third Party Certifier approved by the State of California to meet the CARB standards.** The scope of the certification by the Third Party Certifier includes the confirmation that the manufacturer has implemented the quality systems, process controls, and testing procedures outlined by CARB and that their products conform to the specified regulation limits. The Third Party Certifier also provides ongoing oversight to validate the manufacturers' compliance and manufacturers must be periodically re-certified.

**Does CARB only apply to California?**

Though it currently applies only to products sold in California, **Lumber Liquidators made a**

**decision to require all of our vendors to comply with the California Air Resources Board regulations regardless of whether we intended to sell the products in California or any other state/country.**

<u>**What extra steps does Lumber Liquidators take to ensure compliance?**</u>

In addition to the California Air Resources Board requirements, **Lumber Liquidators regularly selects one or more finished products from each of its suppliers and submits them for independent third-party lab testing.** This is done as a monitoring activity to validate ongoing quality control." (http://www.lumberliquidators.com/ll/flooring/ca-airresources-board-regulations?Wt.ad=GLOBAL_FOOTER_CaliRegCARB).

61.    In addition, the product packaging for many of the PRODUCTS states: "CARB …Phase 2 Compliant for Formaldehyde."



62.    Lumber Liquidators' purchase orders come with a warranty from the manufacturers/packagers stating that the PRODUCTS comply "with all applicable laws, codes and regulations," and "bear all warnings, labels, and markings required by applicable laws and regulations." (www.lumberliquidators.com//ll/customer-care/potc800201).

63.    Lumber Liquidators website guarantees the "highest quality" flooring, and states(emphasis in the original):

15

"**1) INSPECTION** - We inspect your flooring at every stage: before it's finished, during production, and as it's shipped. Our Quality Assurance team operates on three continents, seven countries, and in mills around the world. In fact, on a typical day, a production inspector will walk 12 miles up and down the finishing line to ensure you get only the best."

**2) COMPLIANCE** - We not only comply with laws- we exceed them. For example, California has the highest standards regarding laminate and engineered flooring. All of our mills that produce these products are certified by a Third Party approved by the State of California- and we apply these standards nationwide.

**3) TESTING** - We are continually investing in, testing, evaluating and assuring the highest quality. Our Quality Assurance team includes certified Six Sigma professionals with Master's Degrees in Quality Management and various team members with degrees in Biology, Chemistry, Wood Science and Engineering. They work around the world to test your flooring at every stage. We also regularly send product out to an independent lab          for          additional          testing          to          ensure          quality." (www.lumberliquidators.com/ll/flooring/Quality)

64.     Instead of warning the public about formaldehyde in its PRODUCTS, Lumber Liquidators has engaged in a campaign to minimize the risks of formaldehyde. Lumber Liquidators' website states that formaldehyde, "exists naturally in the environment, our bodies, and in food and is important in the human metabolic process. It is a central building block in the synthesis of many other compounds." The website states further:

**"Formaldehyde –What Is It?**

Formaldehyde is a simple compound made of carbon, hydrogen and oxygen, and is a colorless, strong-smelling gas. It exists naturally in the environment, our bodies, and in food and is important in the human metabolic process. It is a central building block in the synthesis of many other compounds. Man-made formaldehyde is an important chemical used widely by industry to manufacture building materials and numerous household products. Thus, it may be present in substantial concentrations both indoors and outdoors.

(http://server.iad.liveperson.net/hc/s-13045352/cmd/kbresource/kb-7043017384918728504/view_question!PAGETYPE?sf=101133&documentid=415037&=view)

65.     As a result of these public statements and particularly through its use of bold font, Plaintiff believes that Lumber Liquidators, rather than providing an adequate warning about

formaldehyde, instead intentionally tries to make consumers believe that the PRODUCTS they are purchasing are compliant with California's standards for formaldehyde emissions and downplay the toxicity of formaldehyde.

## CLASS ACTION ALLEGATIONS

66.     This action is brought as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Plaintiff named above and all others similarly situated. The class is defined as:

All persons who bought the Products.

Excluded from the proposed Class are:

a.      Defendants;

b.      Any entities in which Defendants have or had a controlling interest;

c.      Any officers or directors of Defendants;

d.      The legal representatives, heirs, successors, and assigns of Defendants; and

e.      Any Judge assigned to this action and his or her immediate family, and anyone who timely requests exclusion from the Class.

67.     **Numerosity – Fed. R. Civ. P 23(a)(1)**:  Members of the proposed Class are so numerous that their individual joinder is impracticable.  The precise identities, number, and addresses of members of the proposed Class are unknown to Plaintiff, but may and should be known with proper and full discovery of Defendants, third-parties, and their respective records. All Class members pray for money damages, temporary and permanent injunctive relief, and declaratory relief because the parties opposing the proposed Class have acted on grounds generally applicable to the proposed Class, thereby making appropriate injunctive relief to the proposed Class as a whole.

17

68.     **Predominance of Common Questions of Fact and Law – Fed. R. Civ. P.**

**23(a)(2); 23(b)(3)**:  There exist questions of law and fact common to all Members of the Class.

Common questions include but are not limited to the following:

a.     Whether the Products are subject to premature failure well in advance of its represented thirty-year useful life;

b.     Whether the Products are not suitable for use as a long-term flooring product;

c.     Whether Defendant knew, or should have known, of the defective nature of the Products before making available for purchase and use by the Plaintiff and the Class;

d.     Whether Defendant failed to disclose to Plaintiff and the Class the defective nature of the Product;

e.     Whether Defendant's failure to disclose material facts violated 815 ILCS 505/1 *ET SEQ.* Illinois Consumer Fraud and Deceptive Business Practices Act;

f.     Whether Defendant's failure to inform purchasers that the Products was susceptible to the failures alleged herein was a material omission, the nondisclosure of which was a deceptive sales practice under the consumer protection statutes of Illinois state law;

g.     Whether Defendant owed a duty to Plaintiff and the Class to exercise reasonable and ordinary care in the testing, design, production, manufacturing, warranting and marketing of the Product;

h.     Whether Defendant breached its duties to the Plaintiff and the Class by designing, manufacturing, producing, marketing, advertising, and selling defective flooring to Plaintiffs and the Class;

i.     Whether Defendant had a duty to Plaintiff and the Class to disclose the true nature of the Product;

j.     Whether the facts not disclosed by Defendant to Plaintiff and the Class are material facts;

k.     Whether Defendant knew, or should have known that the Product would prematurely fail, is not suitable for use as flooring in residences or businesses system, and otherwise is not as represented by Defendant;

l.     Whether, in committing the acts alleged herein, Defendant engaged in unfair competition and in an unfair business practice or practices within the meaning of

815 ILCS 505/1 et seq., Illinois Consumer Fraud and Deceptive Business Practices Act;

m.     Whether such acts or practices were unfair within the meaning of 815 ILCS 510/1 et seq., the Uniform Deceptive Trade Practices Act;

n.     Whether Plaintiff and the Class are entitled to compensatory damages restitution, and the amounts thereof respectively;

o.     Whether Defendant should be declared financially responsible for notifying all Class Members of the defective Product and for the costs and expenses of repair and replacement of all defective flooring materials and providing restitution of monies paid and inadequate value given;

p.     Whether Defendant should be ordered to disgorge, for the benefit of the Class, all or part of their ill-gotten profits received from the sale of defective Product and/or to make full restitution to Plaintiff and the Class Members; and

q.     Whether Defendant should be enjoined from continuing to market the Product, as defined herein, utilizing misleading misrepresentations and omission of material facts;

r.     Whether Plaintiff and the respective class members are entitled to damages;

s.     Whether Plaintiff and the respective class are entitled to treble damages;

t.     Whether Plaintiff and the respective class are entitled to attorneys' fees;

u.     Whether Plaintiff and the respective class are entitled to costs; and

v.     Whether Plaintiff and the respective class members are entitled to an injunction preventing Defendants from engaging in the wrongful conduct alleged throughout the complaint.

69.     **Typicality –Fed. R. Civ. P. 23(a)(3)**:  Plaintiff is a member of the proposed

Class.  The Plaintiff's claims and the claims of the proposed Class have a common origin and

share common bases.  Plaintiff's claims originate from the same unfair, deceptive, and fraudulent

practices of the Defendants, and the Defendants act and have acted in the same way toward

Plaintiff and the proposed Class members.  If brought and prosecuted individually, the claims of

19

each Putative Class member would necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief.

70.     **Adequacy—Fed. R. Civ. P. 23(a)(4); 23(g)(1)**:   Plaintiff is an adequate representative of the proposed Class because Plaintiff's interests do not conflict with the interests of the members of the proposed Class Plaintiff seeks to represent.   Plaintiff has retained competent counsel, and Plaintiff intends to prosecute this action vigorously.   Plaintiff's counsel will fairly and adequately protect the interests of the members of the proposed Class.

71.     **Superiority—Fed. R. Civ. P. 23(b)(3)**: A Class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all Members is impracticable.   Furthermore, as the damages suffered by individual Class Members might be relatively small, the expense and burden of individual litigation makes it impossible for Members of the proposed Class to individually redress the wrongs done to them.   There will be no difficulty in the management of this case as a Class action.

72.     In the alternative, the Class may be certified because:

a.      the prosecution of separate actions by the individual Members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class Members that would establish incompatible standards of conduct for Defendants;

b.      the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not party to the adjudications, or they would substantially impair or impede their ability to protect their interests; and

c.      Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Members of the Class as a whole.

73.     This lawsuit may be maintained as a class action because Plaintiff and the proposed Class seek declaratory and injunctive relief, and all of the above factors of numerosity,

common questions of fact and law, typicality and adequacy are present.  Moreover, Defendants have acted on grounds generally applicable to Plaintiff and the proposed Class as a whole, thereby making declaratory and/or injunctive relief proper and suitable remedies.

74.     This lawsuit may be maintained as a class action because questions of fact and law common to the Class predominate over the questions affecting only individual members of the Class, and a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by each individual class member may be disproportionate to the burden and expense of individual prosecution of complex and extensive litigation to proscribe Defendants' conduct and practices.  Additionally, effective redress for each and every class member against Defendants may be limited or even impossible where serial, duplicate, or concurrent litigation occurs arising from these disputes.  Even if individual class members could afford or justify the prosecution of their separate claims, such an approach would compound judicial inefficiencies, and could lead to incongruous and conflicting judgments against Defendants.

75.     To the extent that there are any contractual prohibitions or other purported impediments to pursue these claims on a class action basis, Plaintiff specifically alleges, and will prove, if necessary, that any such bar is unconscionable, unfair and against the public policy of the State of Illinois.

**COUNT I**
**COMMON LAW FRAUD**

76.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

77.     Defendants knew the true and material facts regarding the defect in the Products as detailed above.  Defendants either knew or recklessly disregarded the potential ramifications

21

of disclosing the Defect with the Products to Plaintiffs and Class members, and failed and/or refused to do so, fraudulently concealing and/or omitting the true and material facts from Plaintiffs and the Class while under a duty to disclose such facts.

78.     These omissions were known to Defendants to be false when made and were made with the intent that Plaintiffs and the Class members would rely on them and to induce Plaintiffs and the Class members to purchase the Products.

79.     Plaintiffs and the other members of the Class, unaware of Defendants' concealment or suppression of said material facts, purchased the Products.  Plaintiffs and the other members of the Class could not have discovered in the exercise of reasonable diligence Defendants' failure to disclose the true facts concerning the Defect in the Products.  Had Plaintiffs and the other members of the Class known of the concealed facts, they would not have purchased the Products or paid as much for the product as they did.

80.      As a proximate result of the foregoing omissions and failures to disclose, Plaintiffs and the other members of the Class have suffered damages.

## COUNT II
## BREACH OF IMPLIED WARRANTY

81.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

82.     Defendants impliedly represented and warranted that the Products being sold to the general public were free of defects, merchantable, and fit for their intended purpose. Defendants breached their implied warranties by selling the Products with a serious, inherent Defect.  Moreover, Defendants made and/or allowed these warranties to be made with the intent of inducing Plaintiffs and the other members of the Class to purchase the Products.

83.     If Plaintiffs and the members of the Class had known the true facts, they would not have purchased the Products or paid as much as they did for the product.

84.     The element of privity, if found to be applicable, exists *vis-à-vis* Defendants and members of the Class because, *inter alia*: (i) Defendants made direct sales to members of the class; (ii) Defendants has had direct written communications with members of the Class with regard to the Products in the form of standardized warranty forms, user guides, registration cards and other similar documents; (iii) Defendants has had direct communications with members of the Class with regard to the Products through television, newspaper and magazine advertisements; and (iv) Defendants has had direct conversations with members of the Class who have called Defendants to complain about the defective nature of the Products.  By reason of the foregoing, the Defendants are, and at all relevant times was, a seller of the Products to members of the Class.

85.     Plaintiff and the members of the Class are entitled to either repudiation of their agreements and repayment of the money they spent to purchase and/or repair, or actual damages in an amount to be determined at the trial of this action, but in an amount less than $75,000 per Class Member.

## COUNT III
## BREACH OF EXPRESS WARRANTY

86.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

87.     The written warranty documents included with the Products constitute express warranties that Defendant refused and/or failed to honor.  Moreover, the time limitations associated with those express warranties were unconscionable and grossly inadequate to protect Plaintiffs and the other members of the Class.  Among other things, Class members had no

meaningful choice in determining those time limitations; the terms of the express warranties unreasonably favored Defendant over members of the Class; a gross disparity in bargaining power existed as between Defendant and members of the Class; and the Company knew the with the Products were defective and would fail well before their useful lives, thereby rendering the time limitations insufficient and inadequate.

88.     Plaintiff and the members of the Class are entitled to either repudiation of their agreements and repayment of the money they spent to purchase and/or repair the Products.

**COUNT IV**
**BREACH OF CONTRACT/ BREACH OF DUTY OF**
**GOOD FAITH AND FAIR DEALING**

89.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

90.     Plaintiff and the Class entered into agreements with Defendant whereby Plaintiff and the Class agreed to pay a certain sum of money for the Products in exchange for Defendant to provide the Products free from the Defect identified in this complaint to Plaintiff and the class members.

91.     Defendants expressly and/or impliedly agreed to provide the Products free from Defect.

92.     Defendants further expressly and/or impliedly agreed to carry out its obligations of good faith and fair dealing.

93.     Defendants breached its contractual obligations, including its contractual obligation of good faith and fair dealing, by providing the Products with the Defect identified in this Complaint.

94.     Plaintiff and the respective Class performed their contractual obligations.

24

95.     The aforementioned breaches of contract have proximately caused the Plaintiff and the Class' damages.

96.     In connection with sales of the Products to Plaintiffs and the Class Members, an implied covenant of good faith and fair dealing existed, and continues to exist.  Defendant impliedly covenanted that it would do nothing to impair or frustrate the rights of Plaintiffs and the Class to receive the full benefit of their purchase.

97.     By misrepresenting the Defect in the Products and the benefits to be received by Plaintiffs and the Class, Defendants breached the implied covenant of good faith and fair dealing they owed to Plaintiffs and the Class.

98.     As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Defendants wrongfully received benefits consisting of proceeds from sales of defective Products.

**COUNT V**
**VIOLATION OF 815 ILCS 505/1 *ET SEQ.***
**ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**

99.     Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs as if fully set forth herein.

100.     The conduct described in this Complaint constitutes a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "CFA"), 815 Ill. Comp. Stat. 505/1etseq, and substantially similar state consumer protection statutes.

101.     Defendant engaged in unfair or deceptive practices in violation of Illinois' Consumer Fraud and Deceptive Business Practices Act  815 Ill. Comp. Stat. 505/1 et seq. (2008) (hereinafter, "CFA") when it (1) represented that the Products were CARB 2 Compliant and free of defects and meets applicable industry standards when, at best, it lacked credible evidence to

support  those claims, and, at worst, knew the Products emitted Formaldehyde in an amount greater than 40 mg/day, was not suitable for use as flooring, and otherwise was not as warranted and represented by Defendant; (2) failed to disclose to, or concealed from, consumers, installers and distributors material facts about the defective nature of the Products; and (3) failed to disclose its own knowledge of the defective nature of the Products; and (4) limited its warranty obligations in an unfair and unconscionable way in light of its failure to disclose the defective nature of the Products.

102.    Defendant either knew or should have known its Products were defective, emitted formaldehyde greater than 40 mg/day, and was not as warranted and represented by Defendant.

103.    Defendant's conduct and omissions described herein repeatedly occurred in Defendant's trade or business and were capable of deceiving a substantial portion of the consuming public.

104.    The facts concealed or not disclosed by Defendant are material facts in that Plaintiffs and any reasonable consumer would have considered those facts important in deciding whether to purchase the Products or purchase homes or structures with flooring applying the Products.  Had Plaintiff and the Class known the Products were defective (and were not CARB 2 Complaint and emitted more than 40 mg/day of Formaldehyde), they would not have purchased the Product, negotiated a lower price to reflect the risk, or simply avoided the risk all together by purchasing different flooring products.

105.    Defendant intended that Plaintiff and the Class would rely on the deception by purchasing its Product, unaware of the undisclosed material facts.  Defendant knew that Plaintiff and the Class would rely on its product literature and advertisements, statements made by its

26

salespeople and other representations.   This conduct constitutes consumer fraud within the meaning of the various consumer protection statutes.

106.    Defendant's unlawful conduct is continuing, with no indication that Defendant will cease.

107.    As a direct and proximate result of the deceptive, misleading, unfair and unconscionable practices of the Defendant set forth above, Plaintiff and Class Members are entitled to actual damages, compensatory damages, penalties, attorney's fees and costs as set forth in Section 10a of the CFA.

108.    The Defendant's deceptive, misleading, unfair and unconscionable practices set forth above were done willfully, wantonly and maliciously entitling Plaintiff and Class Members to an award of punitive damages.

**COUNT VI**
**VIOLATION OF 815 ILCS 510/1 *ET SEQ.***
**THE UNIFORM DECEPTIVE TRADE PRACTICES ACT**

109.    Plaintiff repeats, realleges, and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein.

110.    Pursuant to 815 ILCS 510/1, et seq., a person likely to be damaged by an unfair trade practice of another may be granted injunctive relief upon terms that the court considers reasonable.

111.    In pertinent part, pursuant to 815 ILCS 510/2(a), a person engages in an unfair trade practice when, in the course of his or her business, vocation, or occupation the person… (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have; (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of

27

another; (9) advertises goods or services with intent not to sell them as advertised; (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

112.    As alleged *supra*, in violation of 815 ILCS 510(5) *et seq.*, Defendant, through its employees, agents and representatives, represents that the Products have characteristics, uses, or benefits that they do not have.

113.    As alleged *supra*, in violation of 815 ILCS 510(7) *et seq.*, Defendant, through its employees, agents and representatives, represents that the Products are of a particular standard, quality, or grade when they are that of another.

114.    As alleged *supra*, in violation of 815 ILCS 510(9) *et seq.*, Defendant, through its employees, agents and representatives, advertises the Products with intent not to sell them as advertised.

115.    As alleged *supra*, in violation of 815 ILCS 510(12) *et seq.*, Defendant, through its employees, agents and representatives, engaged in conduct which creates a likelihood of confusion or misunderstanding by selling the Products with the Defect alleged herein.

116.    Each of the aforementioned actions and failures to act of Defendants constitute an unfair trade practices within the meaning of the Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*

117.    As a result of each of the aforementioned unfair trade practice, Defendant has directly, foreseeably, and proximately caused damages to Plaintiff and Class.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks the following relief:

a.      An Order certifying the proposed Class herein and appointing Plaintiff and the undersigned counsel of record to represent the Class;

b.     Injunctive relief requiring Defendant to replace and/or repair all Products installed in structures owned by the Class;

c.     A Judgment awarding Plaintiff and the Class compensatory, consequential, and statutory damages, pre-judgment interest, and post-judgment interest;

d.     A Declaration that Defendant must disgorge, for the benefit of the Class, all or part of its ill-gotten profits received from the sale of defective Product, and/or to make full restitution to Plaintiffs and the Class Members;

e.     A Judgment for actual damages for injuries suffered by Plaintiff and the members of the proposed Class as a result of Defendants' violation of ICFA;

f.     A Judgment awarding Plaintiff and the Class reasonable attorneys' fees and costs of this action in accordance with UDTPA;

g.     a preliminary and permanent injunction, enjoining Defendants, their agents, employees, assigns and all persons acting in concert or participating with Defendants, from offering the PRODUCTS for sale in Illinois without either reformulating the PRODUCTS such that no adequate warning is necessary or providing an adequate warning that the users and/or handlers of the PRODUCTS are exposed to the LISTED CHEMICAL;

h.     an injunctive order compelling Defendants to identify and locate each individual who has purchased the PRODUCTS and to provide a warning to such person that the use of the PRODUCTS will expose the user to chemicals known to cause cancer;

i.     an injunctive order compelling Defendants to waive any applicable restocking fees which would otherwise be charged to an individual who seeks to return the PRODUCTS after receiving an adequate warning;

j.     an award to Plaintiff of Plaintiff's reasonable attorney's fees and costs of suit pursuant to any applicable provision(s) of law, as Plaintiff shall specify in further application to the Court; and

k.     any and all such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

WHEREFORE, Plaintiff demands a trial by jury on all issues so triable as a matter of right.

Dated: March 9, 2015          By:  */s/ William W. Blair*
                                   James G. Onder, IL Bar No. 06200444
                                   William W. Blair, IL Bar No. 06285762
                                   110 E. Lockwood
                                   St. Louis, MO 63119
                                   314-963-9000 telephone
                                   314-963-1700 facsimile
                                   onder@onderlaw.com
                                   blair@onderlaw.com
                                   *Attorneys for Plaintiff*